**Benjamin PORCHER, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. Civ.A. 04–11384–DPW.**

United States District Court, D. Massachusetts.

July 12, 2005.

Andrew Kisseloff, Hale and Dorr Legal Services Center, Jamaica Plain, MA, for Plaintiff.

George B. Henderson, United States Attorney's Office, Boston, MA, for Defendant.

### MEMORANDUM AND ORDER

WOODLOCK, District Judge.

Plaintiff Benjamin Porcher seeks reversal of the decision by the Commissioner of Social Security denying him Supplemental Security Income ("SSI") benefits, contending that the denial was the result of legal error and was unsupported by substantial evidence. I will remand for further proceedings.

## I. Background

### A. Procedural History

In October 2001, Mr. Porcher filed an application for SSI benefits which was initially denied. On reconsideration, the application was denied again and plaintiff requested a hearing by an Administrative Law Judge ("ALJ"). A hearing was held before ALJ J. Alan McKay on September 23, 2003. ALJ McKay denied plaintiff's application on November 26, 2003. The Appeals Council denied a request for review of that decision; that denial constitutes the final decision of the Commissioner of Social Security. Plaintiff thereafter filed this request for review of the Commissioner's decision.

### B. Administrative Law Judge's Summation of the Evidence[1]

At the time of the ALJ's denial of Mr. Porcher's benefits claim, he was 26 years old, had obtained a GED, and presented the ALJ with no relevant work experience. Prior to the onset date of his purported disability, he had done some carpentry and construction work. After the onset date, plaintiff held no gainful employment.

At the hearing, Mr. Porcher appeared with a cane and was able to "answer questions spontaneously." *In re Porcher*, SSA Office of Hearings and Appeals Decision, Nov. 26, 2003, at 2 (R. 14). Mr. Porcher reported burning and throbbing pain in his back that radiated into his legs. He experienced tingling and numbness in his thigh as well as foot pain, exacerbated by walking. The ALJ reported the pain to be "caused by the residuals of a gun shot wound which he had suffered in the past." (R. 14) Mr. Porcher was on medications to alleviate his pain, resulting in the side effect of drowsiness.

The ALJ reported that plaintiff "indicated that he could lift a small television, walk for 10–20 minutes and sit for one to one and a half hours at a time; . . . [and] can stand for 20–25 minutes at a time but would be unable to do any stooping or crawling." (R. 14) Moreover, "[h]e can manipulate objects without difficulty." (R. 14) Mr. Porcher informed the ALJ that he was limited in his ability to play with his daughter and to sleep well due to his physical condition. He also reported that he suffered depression. Mr. Porcher did none of the housework and spent his days watching television, playing video games and watching movies.

The ALJ received testimony from a vocational expert, Ruth Baruch, who opined that someone fitting plaintiff's physical description could perform "numerous jobs with a sit/stand option," providing examples. (R. 14–15) When the ALJ added that the person would also suffer from depression and anxiety causing moderate limitations in concentration, persistence and pace, Ms. Baruch answered that such limitations would still permit performance of the jobs she had suggested: ticket seller, surveillance systems operator, and cashier in a parking lot. However, the positions could not be performed, in the expert's opinion, if the limitations in concentration, persistence, and pace were marked.

The ALJ reviewed the medical evidence, including records from the Boston Medical Center for plaintiff's treatment and recovery in July and August 1999 for his multiple gunshot wounds. On August 11, 1999, plaintiff was admitted to a rehabilitation center at the hospital, a stay lasting until September 8, 1999. At discharge, plaintiff "was independent with bed mobility" and

---

**1.** The following is taken from the decision of the ALJ denying disability benefits to Mr. Porcher, the substance of which is the subject of the instant appeal.

"independent with bowel and bladder management," and noted to be "ambulatory and stable." (R. 15) From January 2000 until March 2000, Mr. Porcher received treatment at the Martha Elliot Health Center. "A note dated January 7, 2000 indicated that the claimant ambulated fairly well without assistance." (R. 15) During this time period, plaintiff complained of pain for which he was given a refill of his pain medication. A March 17, 2000 note indicated that plaintiff suffered from peripheral neuropathy of the left lower extremity.

Mr. Porcher had been treated by a number of health professionals. Carol Wilson, M.A., in a cover letter dated September 23, 2003 indicating that plaintiff had been receiving treatment at Martha Elliot Health Center since June 10, 2002, described plaintiff as having "a depressed and flat affect." (R. 15) Ms. Wilson conducted monthly therapy sessions with Mr. Porcher and indicated that he was doing "exceptionally well." [2] (R. 16)

A psychiatrist, Dr. David Green, also treated Mr. Porcher. An August 5, 2002 note indicated that plaintiff was suffering from a major depressive disorder. By January 21, 2003, a note indicated that plaintiff's condition was stable. Dr. Green noted on June 11, 2003 that plaintiff was still demonstrating symptoms of recurrent depression.

The ALJ was also presented with a July 17, 2003 statement of Dr. Ronald White. Dr. White recounted the injuries sustained by plaintiff and concluded, in the ALJ's recounting of the evidence, that Mr. Porcher could not work.

Mr. Porcher also underwent a consultative examination for the Social Security Administration. Dr. G. Girgis submitted a report dated January 2, 2002, where he noted that plaintiff suffered from a left foot drop that coincided with pain presumed to be neuropathic. Although the doctor indicated that plaintiff was not using a cane and was ambulatory, appearing not to need a foot brace, he did note that Mr. Porcher usually used a cane and would probably require a foot brace. "The doctor stated that the claimant has a painful somatic neuropathy of the left peroneal nerve secondary to his gunshot wound with motor and sensory deficits." (R. 16)

In addition, Dr. Mark Colb completed a physical residual functional capacity form on January 4, 2002, indicating that Mr. Porcher could lift 20 pounds occasionally and 10 pounds frequently. He believed plaintiff should climb, balance, stoop, kneel, crouch, or crawl only occasionally. Mr. Porcher should also avoid exposure to dangerous machinery and unprotected heights.

## II. Discussion

■ Mr. Porcher, in seeking reversal of the denial of SSI benefits, argues that the Commissioner "erred as a matter of law and issued a decision that was not based on substantial evidence." (Pl.'s Brief at 1) He contends that the "[u]ncontroverted evaluations of [his] treating physician, supported by medical evidence, place him squarely at the listing level for mental impairment disability," and that the ALJ substituted his own interpretation of the raw medical data for these conclusions. He alternatively avers that "the ALJ failed to properly consider plaintiff's complaints of pain and emotional impairment in evaluating his residual functional capacity."

---

2. The ALJ cited Ms. Wilson as saying Mr. Porcher was doing "exceptionally well." She did use that language, but qualified the statement by opining that he was doing "exceptionally well concerning those [therapy] sessions." The implication of the context in which "exceptionally well" is found will be discussed below.

■ A district court is empowered to enter a judgment "affirming, modifying, or reversing a decision of the Commissioner of the Social Security Administration with or without remanding the cause for a hearing." 42 U.S.C. § 405(g). Unless the Commissioner committed legal or factual error in evaluating the claim for disability benefits, I must uphold the denial. *Manso–Pizarro v. Sec'y of Health and Human Services*, 76 F.3d 15, 16 (1st Cir.1996).

"Evidence of an impairment is not enough." *DaCosta v. Apfel*, 81 F.Supp.2d 235, 239 (D.Mass.2000) (citing *McDonald v. Sec'y of Health and Human Services*, 795 F.2d 1118, 1120 (1st Cir.1986); *Thomas v. Sec'y of Health and Human Services*, 659 F.2d 8, 9 (1st Cir.1981); 20 C.F.R. §§ 404.1520(f), 416.920(f).) To be disabled, and thereby eligible for benefits, one must suffer from a medical condition which precludes performance of any substantial gainful employment and can be expected to result in death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 416t(i)(1), 423(d)(i).

■ An entitlement to disability benefits must be supported by medical evidence. *See Avery v. Sec'y of Health and Human Services*, 797 F.2d 19, 20–21 (1st Cir.1986); *Winn v. Heckler*, 762 F.2d 180, 182 (1st Cir.1985). And, to the extent the Commissioner's factual findings are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Manso–Pizarro*, 76 F.3d at 16; *Lizotte v. Sec'y of Health and Human Services*, 654 F.2d 127, 128 (1st Cir.1981). Substantial evidence is that which is "rationally adequate on the record as a whole to justify the conclusion." *Roman–Roman v. Comm'r of Soc. Sec.*, 114 Fed.Appx. 410, 411 (1st Cir. 2004) (citing *Rodriguez Pagan v. Sec'y of Health & Human Services*, 819 F.2d 1, 3 (1st Cir.1987) (per curiam), *cert. denied*, 484 U.S. 1012, 108 S.Ct. 713, 98 L.Ed.2d 663 (1988)); *see Rodriguez v. Sec'y of Health and Human Services*, 647 F.2d 218, 222 (1st Cir.1981). A factual finding "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts," however, need not be credited. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999) (per curiam). Finally, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Co.*, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *see Penobscot Air Servs., Ltd. v. F.A.A.*, 164 F.3d 713, 718 (1st Cir.1999).

The Social Security Regulations mandate a five-step process for the evaluation of claims for SSI. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

The Commissioner first determines whether an individual is currently performing "substantial gainful activity," which is defined as significant mental or physical activities of the sort usually done for pay or profit. 20 C.F.R. § 404.1520(a)(4)(i).

The Commissioner then asks whether the claimant has a "severe impairment," one which "significantly limits the claimant's physical or mental capacity to do basic work activities." 20 C.F.R. § 404.1520(a)(4)(ii).

The Social Security Administration ("SSA") then further inquires into the medical severity of the claimant's impairment by determining whether it satisfies the duration requirement and "meets or equals one of our listings in appendix 1 of this subpart." 20 C.F.R. § 404.1520(a)(4)(iii).

At the fourth step, the Commissioner must assess the claimant's residual functional capacity ("RFC") and inquire whether the impairment permits the kind of

mental and physical demands of the claimant's past work. 20 C.F.R. § 404.1520(a)(4)(iv).

■ Finally, the Commissioner asks whether, in light of the RFC, age, education, and work experience of the claimant, he can "make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). At this last step, the burden is on the SSA to establish that there are jobs in the national economy that the claimant could perform. *See Ortiz v. Sec'y of Health and Human Services,* 890 F.2d 520, 524 (1st Cir.1989) ("[O]nce a claimant has demonstrated a severe impairment that prohibits return to his previous employment, the Secretary has the burden of proving the existence of other jobs in the national economy that the claimant can perform."); *Lancellotta v. Sec'y of Health and Human Services,* 806 F.2d 284, 284 (1st Cir.1986).

The ALJ applied this analytical framework to Mr. Porcher's request for benefits: "In accordance with the Social Security Act, as amended, the Commissioner of the Social Security Administration has established a sequential evaluation process to be followed in determining disability." (R. 16 (citing 20 C.F.R. § 416.920)). At the first step, whether Mr. Porcher had "engaged in substantial gainful activity since [his] alleged onset date" of September 8, 1999, the ALJ found that he had not. The ALJ then found that under the standards of the second step of the analysis the claimant had "severe" impairments: "The evidence supports the finding that the claimant suffers from residuals of a gunshot wound,

depression secondary to physical limitations, anxiety, and a fracture of the left ankle." (R. 17)

The ALJ found, however, at the next step that claimant did not have "any 'severe' impairments which meet or equal, either singularly or in combination, the severity [of] any of the criteria of the Listings of Impairments described in Appendix 1 to subpart P of Regulations No. 4." Plaintiff contends that the ALJ substituted his own medical evaluation for that of Mr. Porcher's treating physician. But, the ALJ reported he had "[i]n reaching this conclusion, ... considered the opinions of the state agency medical consultants who evaluated this issue at the initial and reconsideration levels of the Administrative review process and reached the same conclusion." (R. 17)

Although it is true that Dr. White believed Mr. Porcher was "unable to work," (R. 277),[3] there was contrary medical evidence in the record. (*See* R. 224–235) It is this evidence the ALJ cited, not his own independent medical evaluation, in reaching his conclusion at the third step of the analysis. That is not legal error in so far as the finding is based on Mr. Porcher's exertional limitations alone; "a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." *Rodriguez,* 647 F.2d at 222. The evidence, however, was not limited to exertional limitations. There was evidence of mental impairment as well, and, if sufficiently severe, such an

---

**3.** Dr. White wrote that Mr. Porcher was unable to work in the context of a brief handwritten note:

> I am writing concerning Mr. Benjamin Porcher had had [sic] gunshot wound left leg [sic] and abdomen. There is evidence of recent fracture left ankle [sic]. He is unable to work. Contact me if you have questions.

(R. 277) One reading of this note is that Mr. Porcher is unable to work because of his permanent injuries. I note, however, that it could also be read as temporally limited and tied to the recent ankle fracture. In any event, because of the contrary medical evidence concerning Mr. Porcher's physical limitations, it is not necessary to determine the implication of Dr. White's opinion.

impairment can meet the requirements of the third analytical step.

Plaintiff argues that he qualifies for benefits for his mental impairments alone—meeting or equaling a disability listing and, thereby, satisfying the third step of the analytical paradigm—citing the criterion of § 12.04 of 20 C.F.R. Part 404 Subpart P Appx. 1 ("Mental Disability Listings"), which covers affective disorders, and § 12.06, which covers anxiety disorders.

Section 12.04 of the Mental Disability Listings provides in pertinent part:

Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions, or paranoid thinking . . .

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration . . . .

And, section 12.06 of the Mental Disability Listings provides:

In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.

A. Medically documented findings of at least one of the following:

1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or

b. Autonomic hyperactivity; or

c. Apprehensive expectation; or

d. Vigilance and scanning;

or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear,

terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

Plaintiff points to the notes of Dr. Green, his treating psychiatrist, to support the contention that he meets the Mental Disability Listings requirements and is, therefore, disabled. While it is true that Dr. Green lists a number of mental health symptoms—plaintiff notes five—that are found in § 12.04A, plaintiff does not point the court to any place where Dr. Green concluded *in haec verba* that the effect of these symptoms on his daily life, social functioning, or persistence, concentration, or pace was "marked." Dr. Green did write in his notes that plaintiff was "Clearly unable to function vocationally due to depressive symptoms." This, one could argue, implies a conclusion on his part that those symptoms are marked.

Even if that conclusion were undeniably clear, which it is not, plaintiff must satisfy two of the four provisions in § 12.04B. In

this connection, plaintiff contends that the "ALJ identified moderate deficiency in concentration[,] persistence, or pace, satisfying § 12.04B." But, the regulations clearly require "marked" limitations, not moderate ones. The ALJ presented hypothetical scenarios to the vocational expert that crystallize this important distinction. He found that plaintiff could perform certain sit/stand jobs with his limitations, concluding that Mr. Porcher's mental limitations were moderate, not marked.

There does not appear to be a question that substantial evidence in the form of medical reports are found in the record to support the conclusion that, absent other limitations, Mr. Porcher would not be disabled under the Act. But the assessment of mental impairments must take the ALJ along two routes. First, he must determine whether the impairments are sufficient on their own to constitute disabling conditions. Second, if they are not so severe, he must determine whether, taken together with the physical and other non-exertional limitations, they are substantial to a degree warranting disability payments. To resolve either of those questions, the ALJ must carefully evaluate the evidence in the record regarding plaintiff's mental condition.

Here, in reaching his decision, the ALJ relied upon Ms. Wilson's report that plaintiff was doing "exceptionally well" in his therapy sessions, concluding that Mr. Porcher had "only a moderate limitation in his ability to maintain concentration, persistence and pace." (R. 18) He noted that Dr. Green did not believe plaintiff could work, but nevertheless concluded that the medical evidence did not support the doctor's opinion. On this latter point, it is not entirely clear to what medical evidence the ALJ is referring.

Plaintiff argues that when Ms. Wilson's statement is read in context it's meaning is not that which the ALJ gave it. Ms. Wilson included the observation in a September 23, 2003 cover letter accompanying notes of Dr. Green she forwarded to plaintiff's legal advocate:

This letter will verify that Mr. Benjamin Porcher was seen here beginning June 10, 2002. At that time, while evaluating Mr. Porcher's mental status, I noticed that he appeared to have a depressed and flat affect. I referred Mr. Porcher to the department psychiatrist, Dr. David Green. Mr. Porcher had met with Dr. Green on August 5, 2002 and has been receiving on going services with Dr. Green.

Attached please find notes from those sessions. I am seeing Mr. Porcher in individual monthly therapeutic sessions, Mr. Porcher is doing exceptionally well concerning those sessions....

(R. 252). The context raises impediments to putting too much emphasis on Ms. Wilson's observation. First, it appears in a cover letter to plaintiff's attorney and not in evaluative notes or in response to directed inquiry that could clarify the nature and extent of the opinion. Furthermore, it is not clear from the letter whether he is doing "exceptionally well" mentally or, instead, whether Ms. Wilson is complementing plaintiff on his commitment to the monthly sessions. In short, I do not find that this isolated comment could form the basis for determining the extent of Mr. Porcher's mental impairment.

A September 16, 2003 letter from Ms. Wilson to plaintiff's legal advocate actually contains language that arguably speaks more clearly to his mental and physical prognosis: "It is my assessment that he will continue to be successful in his recovery and he is capable and responsible." (R. 261) Again, however, the comment is made in a cover letter and is not a clear evaluative conclusion by a mental health professional.

By contrast, Dr. Green noted in the medical records that plaintiff is "[c]learly unable to function vocationally due to depressive symptoms." (R. 259). While the "law in this circuit does not require ALJ's to give greater weight to the opinions of treating physicians," *Arroyo v. Sec. of Health and Human Services,* 932 F.2d 82, 89 (1st Cir.1991), Dr. Green's opinion must be addressed directly when there are no countervailing mental RFC forms or evaluative statements by other professionals in the record.[4] The ALJ certainly was permitted to base his conclusion on contrary medical evidence, but, here there are indications that the ALJ reached a conclusion regarding Mr. Porcher's mental condition based on his own interpretation of the medical records. *Cf. Nguyen,* 172 F.3d at 35 ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the determination."); *see Perez v. Sec. of Health and*

---

**4.** The absence of a mental RFC alone does not foreclose the possibility of the ALJ finding no significant limitations due to mental impairment. For instance, in *Santiago v. Sec'y of Health and Human Services,* 944 F.2d 1 (1st Cir.1991),

Claimant contend[ed] that, as RFC is a medical assessment, 20 C.F.R. § 404.1545(a), the ALJ was not permitted to determine RFC without having in the record an expert's RFC report. We reject

this contention on these facts. The record here reflects only relatively mild mental and physical impairments and claimant never clarified the particular respects in which these are alleged to prevent her from performing her past work. In such circumstances the ALJ could determine she was not disabled without requiring an expert's RFC evaluation as part of the record.

*Id.* at 4–5.

*Human Services,* 958 F.2d 445, 446 (1st Cir.1991) (per curiam) ("[A]n ALJ is not qualified to interpret raw medical data in functional terms.").

To be sure, it is not the job of the district court to resolve evidentiary disputes. *See Dupuis v. Sec'y of Health and Human Services,* 869 F.2d 622, 624 (1st Cir.1989) ("The function of weighing evidence is the Secretary's."). Here, however, the ALJ clearly stated that he based his conclusion that Mr. Porcher's mental impairments were moderate on reports of him doing "exceptionally well" in therapy. For the reasons stated above, I find that evidence insufficient in isolation. In light of the absence of a mental RFC evaluation by the SSA in the record [5] and without commenting on how the notes of Dr. Green should be read, I will instruct that on remand the ALJ make his mental impairment findings based on all of the psychiatric evidence in the record. And, if Ms. Wilson's opinion is to be given weight, it should be framed with greater precision.

With that said, it is not the case, as plaintiff would have it, that the record is clear on this point. The ALJ could arguably find that the medical evidence in the record does not support Mr. Porcher's claims. But the finding must be based on substantial evidence and Ms. Wilson's isolated comments do not suffice. Reopening the record to permit Dr. Green and a psychiatrist for the SSA to submit mental RFC forms may help in reaching a resolution based upon substantial evidence.

Failure to qualify for disability benefits at the third step of the analysis, based either on the exertional limitations or mental impairment of plaintiff, moreover, does not end the inquiry. Plaintiff argues that the ALJ, at the fifth step of the analysis—determining "whether the claimant retains the residual functional capacity to ... adjust to other work"—failed to account for "subjective and medical evaluations" of mental impairment and pain in reaching his conclusion. When it appears in the record, such evidence of non-exertional limitations must be factored into the analysis when the ALJ turns to the fifth step.[6]

The ALJ did factor mental impairment into step five of his analysis, but, for the reasons stated above, the basis in the record for finding the limitation moderate, as opposed to marked, is less than substantial. If the ALJ intended to reject Dr. Green's opinion as unsupported and find Mr. Porcher's contentions not credible, he should have made findings based on the evidence in the record—above and beyond Ms. Wilson's isolated comments in a cover letter—demonstrating why such a conclusion is warranted.

That does not conclude the analytical process, however. In addition to evidence of mental impairment, the record included evidence of pain suffered by plaintiff. The Social Security Act "provides ... 'that other evidence including statements of the claimant or his doctor, consistent with the medical findings, shall be part of the calculus.'" *DaRosa,* 803 F.2d at 25 (quoting *Avery,* 797 F.2d at 21). The First Circuit

---

5. There is a "Psychiatric Review Technique" form in the record. (R. 236–49) Dr. Maxwell G. Potter checked the box labeled "Insufficient Evidence" under the "Medical Disposition(s)" section of the form and apparently did not conduct an independent assessment. It is not clear whether this is a medical conclusion that no mental impairment is suffered by Mr. Porcher, or rather, whether the doctor simply reviewed a paper record which did not include Dr. Green's notes.

6. The fourth step, whether claimant retains the capacity to perform past work, is not implicated here, where the ALJ found that Mr. Porcher had no relevant past work experience.

has "interpreted the Act [to] require[ ] that 'there must be a clinically determinable medical impairment that can reasonably be expected to produce the pain alleged.'" *Id.* (quoting *Avery,* 797 F.2d at 21).

The ALJ noted that "[i]n addressing the residual functional capacity issue, consideration must be given to the subjective allegations of the claimant." (R. 17) He then outlined "the guidelines for evaluating the claimant's condition which have been set forth on [sic] accordance with the decision in the case of [*Avery* ]." (R. 17)

> In evaluating subjective complaints, the [ALJ] must give careful consideration to all avenues presented which relate to such matters as:
>
>     1. The nature and location, onset, duration, frequency, radiation, and intensity of pain;
>
>     2. precipitating and aggravating factors (E.G. movement, activity, environmental condition);
>
>     3. [t]ype, dosage, effectiveness and adverse side-affects [sic] of any pain medications;
>
>     4. [t]reatment, other than medication for relief of pain;
>
>     5. [f]unctional restrictions; and
>
>     6. [t]he claimant's daily activities.

(R. 17–18). "The [ALJ] conclude[d] that the claimant's allegations that he would be unable to perform all types of work due to his medical condition are not credible to the extent alleged in light of the claimant's medical treatment and the reports of the claimant's treating and examining physicians as well as the claimant's own testimony." (R. 18)

As the ALJ recognized, when examining RFC at step five—where, as here, nonexertional limitations are in play—the statutory guidelines for potential jobs serve only as a framework and are not controlling. *See Nguyen,* 172 F.3d at 36 ("Pain can constitute a significant non-exertional impairment which precludes naked application of the Grid and requires use of a vocational expert."); *Ortiz,* 890 F.2d at 524. In such instances, a vocational expert can help satisfy the Secretary's burden. Here, the vocational expert was presented with a third hypothetical not mentioned by the ALJ in his recounting of the evidence, where—for purposes of the hypothetical at least—the pain described by plaintiff was completely credited. Ms. Baruch concluded that in such an instance there would be no appropriate jobs in the national economy.

There does not appear to be a dispute that plaintiff experienced a certain degree of pain as a result of his injuries.[7] But, in his findings, the ALJ did not include pain as a discrete non-exertional limitation,[8] though he did note plaintiff's ability to lift a small television, walk for 20–25 minutes, sit for one and a half hours, and stand between 20 and 25 minutes. Implied in the ALJ's decision is that he found such

---

7. *See Nguyen v. Chater,* 172 F.3d 31, 34 (1st Cir.1999) (per curiam) ("Since, following the medical advisor, the ALJ conceded that claimant's condition was painful, his determination of residual functional capacity had to take into account the severity of claimant's pain and the extent to which it impeded his ability to work. In making this assessment, the ALJ was required to consider evidence in addition to medical tests, including, *inter alia,* claimant's statements, opinions of treating physicians, reports of claimant's activities and claimant's course of treatment.") (citations omitted).

8. *See generally Dupuis,* 869 F.2d at 623 ("In determining the weight to be given to allegations of pain, ... complaints of pain need not be precisely corroborated by objective findings, but they must be consistent with medical findings.") (citing *DaRosa,* 803 F.2d at 26; *Avery,* 797 F.2d at 21).

exertional capability to be inconsistent with the pain described. *Cf. Torres v. Sec. of Health and Human Services*, 870 F.2d 742, 745 (1st Cir.1989) ("[T]he ALJ must determine what evidence he credits in order to pose a hypothetical which will be relevant and helpful.")[9] Such credibility determinations are left to the ALJ. *Ortiz*, 955 F.2d at 769 ("It is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence.").

Nevertheless, and because the case will be remanded in any event, the ALJ should make an explicit finding regarding the degree of pain suffered by plaintiff and how that, factored into the analysis along with the physical and mental impairments of plaintiff, impacts, if at all, the RFC determination at step five. *Cf. DaRosa*, 803 F.2d at 26 ("On remand, the ALJ is still free to find the appellant's testimony regarding his pain and exertional limitations is not credible. This result, however, must be supported by substantial evidence and the ALJ must make specific findings as to the relevant evidence he considered in determining to disbelieve the appellant.")

In sum, the ALJ should make explicit findings regarding the extent of plaintiff's mental impairment and pain, and factor such findings into the analysis at steps three and five as appropriate. If necessary, more evidence may be taken into the record to permit thorough analysis of the relevant points. *Cf. Perez*, 958 F.2d at 446 ("We have held ... that where an ALJ reaches conclusions about claimant's physical exertional capacity without any assessment of residual functional capacity by a physician, the ALJ's conclusions are not supported by substantial evidence and it is necessary to remand for the taking of further functional evidence.").

### III.   Conclusion

For the foregoing reasons, the motion to affirm of defendant is DENIED, the decision of the Commissioner is VACATED and the case REMANDED for further proceedings consistent herewith.

---

9. To the extent hypothetical questions posed to an expert are based on unsubstantiated findings—which would include, arguably, the moderate mental limitations described in the second hypothetical to Ms. Baruch, *see supra*—the expert's opinion need not be credited. *See Arocho v. Sec'y of Health and Human Services*, 670 F.2d 374, 375 (1st Cir.1982) ("[I]n order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities.").